```
                  UNITED STATES DISTRICT COURT

                  EASTERN DISTRICT OF LOUISIANA


AMY RICHARD HOWELL                        CIVIL ACTION

VERSUS                                    NO: 12-293 c/w
                                          12-2448


AVANTE SERVICES, LLC, ET AL.              SECTION: R
```

### ORDER AND REASONS

Hilcorp Energy Company ("Hilcorp") filed this declaratory-judgment action against Alliance Oilfield Services, LLC ("Alliance").[1] Hilcorp and Alliance both move for summary judgment.[2] For the following reasons, the Court GRANTS Alliance's motion and DENIES Hilcorp's motion.

I.   INTRODUCTION

Philip Kliebert died on April 18, 2011 after he fell through a large whole in the deck grating on Hilcorp's West Cameron 643-A platform ("platform"). Kliebert worked for Alliance at the time of his death. Alliance had entered a Master Service Contract ("MSC") with Hilcorp, under which Alliance agreed to perform services on the platform and to indemnify Hilcorp for any personal injury claims by Alliance employees and their relatives.

---

    [1]    12-2448.

    [2]    R. Doc. 58; R. Doc. 60.

Alliance also agreed name Hilcorp as an additional insured under its insurance policies.

Amy Richard Howell, Natural Tutrix of Kliebert's minor children, filed a wrongful death and survival action against Hilcorp.[3] Hilcorp brought a declaratory judgment action against Alliance seeking a declaratory judgment that the indemnity and additional-named-insured provisions of the MSC are valid and enforceable. Hilcorp now moves for summary judgment on that claim. Alliance also seeks summary judgment maintaining that the Louisiana Oilfield Anti-Indemnity Act ("LOAIA") makes its indemnity obligation void and unenforceable. The following is an account of the platform, the MSC, and the accident.

**A.   FACTUAL BACKGROUND**

On July 30, 2008, Hilcorp purchased the platform's lease from Chevron U.S.A., Incorporated.[4] This was the first of a series of Hilcorp acquisitions aimed at "find[ing] more production" in the Gulf of Mexico.[5] The wells at the platform were producing for about one month until August 30, 2008, when

---

[3]   R. Doc. 1.

[4]   R. Doc. 60-5 at 1-2.

[5]   R. Doc. 60-4 at 3.

they were shut-in because of Hurricane Ike.[6] Hurricane Ike destroyed the Tennessee Gas Pipeline Company ("TGP") pipeline servicing the platform.[7] TGP decided not to repair the pipeline, and "without a pipeline . . . there was no economically feasible way to get the gas, which was the predominant producer from [the platform], back to shore."[8]

By law, Hilcorp would lose its lease 180 days after production ceased unless it obtained a suspension of production ("SOP") from the Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE").[9] BOEMRE issued Hilcorp two SOPs on March 13, 2009, and January 6, 2010.[10] Hilcorp requested a third SOP on May 26, 2010, but BOEMRE denied the request and terminated Hilcorp's lease on June 1, 2010.[11] Upon termination of its lease, Hilcorp was required to inform the government of its intention to "either reestablish production of these wellbores or to plug and abandon these wellbores."[12] Hilcorp informed the government of

---

[6]  R. Doc. 60-4 at 9; R. Doc. 60-5 at 2 ("production ceased on 08/30/2008).

[7]  R. Doc. 60-6.

[8]  R. Doc. 60-4 at 11-12.

[9]  *Id.* at 13.

[10] R. Doc. 60-7.

[11] R. Doc. 60-8.

[12] R. Doc. 60-4 at 14.

its plan to "immediately . . . plug and abandon[] . . . the wellbores and remov[e] the platforms."[13] On February 10, 2011, Hilcorp submitted its Idle Iron Abandonment Plan to BOEMRE.[14]

Hilcorp contracted with multiple parties to carry out its plan to plug and abandon the wells. On June 24, 2010, Hilcorp entered into the MSC with Alliance.[15] The MSC outlines Alliance's obligations as follows:

> [Hilcorp] may (i) utilize the services of [Alliance] from time to time in connection with the construction and/or operation of properties and facilities for exploration of, or the development or production of, oil, gas, or other minerals and other activities directly or indirectly related thereto, and/or (ii) purchase or rent goods, equipment, or facilities from [Alliance]. The work and services to be performed by [Alliance] for [Hilcorp] may include, but shall not be limited to, the following: *P+A Services, Pump Services*.[16]

The MSC further stipulates that General Maritime Law would govern the contract[17] and that "[u]nless [Hilcorp] and an authorized officer of [Alliance] hereto specifically agree in writing otherwise, this Contract shall control and govern all work and services performed by [Alliance] for [Hilcorp] and shall be deemed to be incorporated in full in every subsequent oral and/or

---

[13]   *Id.* at 15.

[14]   R. Docs. 60-9-60-12.

[15]   R. Doc. 60-13.

[16]   R. Doc. 60-13 at 2 (emphasis added).

[17]   *Id.* at 11.

written work order or purchase voucher."[18] Importantly, the MSC obligates Alliance to "protect, defend, indemnify and hold [Hilcorp] harmless from and against" all claims asserted by Alliance's employees and their spouses or relatives "due to bodily injury, personal injury, or death."[19]

On April 18, 2011, Kliebert died while performing work to cut and pull casings out of a wellbore on a well platform. The accident causing Kliebert's death was described as follows:

> [T]he Sparrows crane operator was lifting a swivel stand to move it from the working hole in order to facilitate positioning of the casing jacks over the hole to remove the casing. When the Sparrows crane operator commenced the lift, the load swung away from Phillip Kliebert causing him to fall forward into the open hole in the deck crated by the removal of the swivel stand.[20]

When Howell sued Hilcorp for wrongful death, Hilcorp sought indemnity and insurance protection form Alliance. Alliance now invokes the Louisiana Oilfield Anti-Indemnity Act ("LOAIA"), La. Rev. Stat. Ann. § 9:2780 (2012), to shield it from any obligation to indemnify Hilcorp or list Hilcorp as an additional insured.

**II.   SUMMARY JUDGMENT STANDARD**

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the

---

[18]   *Id.* at 2.

[19]   *Id.* at 7.

[20]   R. Doc. 1.

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth ultimate or conclusory facts and conclusions of law are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (internal quotation marks omitted).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence that would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263-64 (5th Cir. 1991)(citation omitted). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324.

The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *Id.* at 325. *See also Little*, 37 F.3d at 1075 ("Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'")(citing *Celotex*, 477 U.S. at 332).

**III. THE LOUISIANA OILFIELD ANTI-INDEMNITY ACT**

The parties do not dispute that Louisiana law applies to this case under the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331-1356a. *See Teaver v. Seatrax of La., Inc.*, No. 10-1523, 2012 WL 5866042, at *3 (E.D. La. Nov. 19, 2012). The Louisiana legislature adopted LOAIA to correct "an inequity [] foisted on certain contractors . . . by the defense or indemnity provisions

. . . , contained in some agreements pertaining to wells for oil, gas, or water, or drilling for minerals . . . ." La. Rev. Stat. Ann. § 9:2780(A). It makes "void and unenforceable" any "provision contained in, collateral to, or affecting an agreement pertaining to a well for oil, gas, or water . . . to the extent that it purports to or does provide for defense or indemnity," or requires "additional named insured endorsements." *Id.* § 9:2780(B), (G). LOAIA further defines "'agreement,' as it pertains to a well for oil, gas, or water" as:

> any agreement . . . concerning *any operations* related to the exploration, development, production , or transportation of oil, gas, or water . . . or any agreement to perform any portion of any such work or services or any act collateral thereto, including . . . other goods and services furnished in connection with any such service or operation.

*Id.* § 9:2780(C)(emphasis added). These "operations" include "but [are] not limited to . . . plugging, or otherwise rendering services in or in connection with a well drilled for the purpose of producing . . . or other structure intended for use in the exploration for or production of any mineral . . . " *Id.*

The Fifth Circuit has synthesized these provisions into a two-part test: "[I]f (but only if) the agreement (1) pertains to a well *and* (2) is related to exploration, development, production, or transportation of oil, gas, or water, will the Act invalidate any indemnity provision contained in or collateral to that agreement." *Transcon. Gas Pipe Line Corp. v. Transp. Ins.*

8

*Co.*, 953 F.2d 985, 991 (5th Cir. 1992). This is a fact-intensive inquiry, and *Transcontinental* provides a nonexclusive list of factors to consider in making it. *Id.* at 994-95. "The decisive factor in most cases has been the functional nexus between an agreement and a well or wells." *Verdine v. Ensco Offshore Co.*, 255 F.3d 246, 252 (5th Cir. 2001) (citing *Roberts v. Energy Dev. Corp.*, 104 F.3d 782, 784-85 (5th Cir. 1997)). The Louisiana Supreme Court adopted the *Transcontinental* test in *Fontenot v. Chevron U.S.A. Inc.*, 676 So. 2d 557, 564 (La. 1996).

### A.  THE RELEVANT AGREEMENT

Before determining whether an agreement pertains to a well under LOAIA, the Court must first identify the relevant agreement. Alliance argues that the agreement to provide "P+A services" under the MSC is the relevant agreement, while Hilcorp seeks to limit the agreement to an oral work order instructing Alliance to cut and pull casings from the wellbore on the date of Kliebert's death. Hilcorp essentially argues that "plugging" was a separate phase of the operation that was already completed when the order to "cut[] and pull[] casings"[21] from the wellbores on the platform's wells was carried out. Hilcorp argues that the agreement to cut and pull casings does not relate to a well because West Cameron 643-A was incapable of producing

---

[21]   *Id.* at 17.

hydrocarbons at the time Alliance performed this work. Hilcorp agrees that this later phase was performed under the MSC.

Alliance does not dispute that an oral work order can be the relevant agreement for LOAIA purposes. Indeed, the Fifth Circuit has noted that a "oral work order is the relevant agreement" for the *Transcontinental* test. *See Roberts*, 104 F.3d at 784 n.3; *Teaver*, 2012 WL 5866042 at *4 & n.6 (analyzing service orders to dismantle a crane even though dismantling was part of the overall P&A job). Rather, Alliance argues that even assuming that there was an oral agreement for Alliance to cut and pull the casings, the LOAIA still applies because the task of cutting and pulling casings was part and parcel of plugging and abandoning the well.

### B. LOAIA APPLIES

#### 1. THE AGREEMENT PERTAINS TO A WELL

A straightforward reading of the plain language of the LOAIA reveals it covers Alliance's oral work order with Hilcorp to cut and pull casings from the wellbore. As an example of the subject of an "agreement" under the statute, LOAIA lists "plugging" and "any act collateral thereto." La. Rev. Stat. Ann. § 9:2780(C). Cutting and pulling the casings from the wellbore is collateral to plugging the well.

Furthermore, under the Fifth Circuit's framework for evaluating whether the LOAIA covers the agreement, the Court

finds that the oral agreement between Hilcorp and Alliance to cut and pull the casings from the wellbore pertains to a well. The Fifth Circuit has noted that when, as here, the contract at issue does not concern the transportation of oil or gas, some of the *Transcontinental* factors are not relevant. *Broussard v. Conoco, Inc.*, 959 F.2d 42, 44-45 (5th Cir. 1992). Some factors remain relevant, such as:

> (1) whether the structures or facilities to which the contract applies or with which it is associated are part of an in-field production system; (2) what is the geographical location of the structure or facility relative to a well or wells; (3) what is the purpose or function of the facility or structure in question; (4) who owns and operates the relevant facility or structure; (5) and "any number of other details affecting the functional and geographic nexus between 'a well' and the structure or facility that is the object of the agreement...."

*Id.* at 45 (citing *Transcon.*, 953 F.2d at 994-95).

These factors support finding that the agreement pertained to a well. Hilcorp, an exploration and production company, owned the platform and the casings. The casings were part of the well production system, as the casings lined the wellbores of the wells.[22] Further, the purpose of the casings was to assist in gas and oil production, as casings keep the well from collapsing. The casing pipe was in the wellbore, thus providing a geographic nexus between the wells and the casings. Finally, there is a

---

[22] *See* R. Doc. 60-1 at 16, 18 (discussing that the agreement was to cut and remove casing "from the former wellbores").

functional nexus between the object of the agreement, the casings, and the well itself. The casings were part of the wellbore and were being disconnected. Accordingly, the agreement related to a well under the *Transcontinental* test.

To avoid the LOAIA's application, Hilcorp attempts to fashion a new inquiry into the *Transcontinental* test. Hilcorp shows that at the time of the accident the wells were not producing and argues that "where a structure is no longer involved in or capable of hydrocarbon production, an agreement for services pertaining to that structure is <u>not</u> an agreement that pertains to a well."[23] This argument, however, is foreclosed by the Fifth Circuit's decision in *Verdine*.

At issue in *Verdine* was an agreement to refurbish the Ensco 23, a platform that was "not participating in in-field exploration, production, or transportation of oil or gas." *Verdine*, 255 F.3d at 253. The Court noted:

> The Louisiana legislature clearly envisioned the Act's application to agreements for services on structures that were not developing, producing or transporting oil or gas or geographically connected to a specific well. We do not interpret the legislature's requirement that an agreement pertain to a well in such a restrictive manner that we overlook agreements to which the Act was intended to apply. The Act encompasses agreements for services on structures intended for use in the oil and gas industry, so long as the agreement pertains to a well or wells.

---

[23] R. Doc. 60-1 at 15.

*Id.* at 253-54. Finally, the Court observed that "while the Ensco 23 was not involved in exploration and production activities at the time Centin performed its contractual obligations, the platform was designated for use on particular wells. Centin's services were performed on a structure intended for use in the exploration and production of oil and gas." *Id.* at 254.

Hilcorp puts forth evidence showing that it was not economically feasible to produce oil from the wells in 2008, that it lost the legal right to extract oil from the wells in 2010, and that when Alliance began to cut and pull casings from the wellbore the well was permanently plugged.[24] Accordingly, Hilcorp argues, at the time of its agreement with Alliance, the platform and the well were not "intended" for use in the exploration and production of oil and gas and therefore the agreement did not pertain to a well. La. Rev. Stat. Ann. § 9:2780(C).

Hilcorp's argument misses the Fifth Circuit's point in *Verdine* when the Court said: "We do not interpret the legislature's requirement that an agreement pertain to a well in such a restrictive manner that we overlook agreements to which the Act was intended to apply." *Verdine*, 255 F.3d at 253. As noted, the LOAIA covers agreements concerning "plugging" and acts "collateral" to plugging. La. Rev. Stat. Ann. § 9:2780(C). Hilcorp's reading would exclude plugging and activities

---

[24] R. Doc. 60-1 at 16.

collateral to plugging which LOAIA expressly covers. This follows because a plugged well is not involved in producing hydrocarbons, which is the *sine qua non* of Hilcorp's test for when an agreement pertains to a well under the LOAIA. Following *Verdine*, this Court will not interpret the requirement that an agreement pertain to a well to exclude agreements to which the Act was intended to apply. *Id.*

Instead, any "structure intended for use in the exploration for or production of any mineral" refers to the general purpose of the structure, not its use at the precise moment in time the work was performed. It is undisputed that the wells at issue were productive for one month in 2008,[25] that Hilcorp purchased the lease with the intention of "find[ing] more production," and that the purpose of the wells was to produce oil and gas.[26] Accordingly, the wells were "intended for use" in the oil and gas industry. La. Rev. Stat. § 9:2780(C); *Verdine*, 255 F.3d at 254; *Teaver*, 2012 WL 5866042 at *5 (holding that an agreement to dismantle a crane used in a plug and abandon operation was covered by LOAIA even though the wells were not nonproducing).

Hilcorp relies on *Hughes v. Pogo Producing Co.*, NO. 06-1894, 2009 WL 667186 (W.D. La Mar. 11, 2009). *Hughes* involved a platform that was "merely a co-mingling station where the natural

---

[25] R. Doc. 60-4 at 9.

[26] R. Doc. 60-4 at 3.

gas from three incoming pipelines–each of which carries the commingled production of multiple wells-is further co-mingled and pumped into one pipeline destined for the refinery." *Hughes*, 2009 WL 667186 at *3. The agreement in *Hughes* was for the maintenance of the platform. The Court noted that where:

> the work required by the contract is performed on a gas transmission equipment at a reasonably determinable point at which the gas can no longer be identified with a particular well, or is so fundamentally changed in processing, commingling, or preparing it for distribution to its ultimate end user, that the gas no longer "pertains to a well."

*Id.* at *6 (citing *Lloyds of London v. Transon. Gas Pipe Line Corp.*, 38 F.3d 193, 196 (5th Cir. 1994)). *See also Labove v. Candy Fleet, L.L.C.*, No. 11-1405, 2012 WL 3043168, at *3 (E.D. La. July 20, 2012) (LOAIA did not apply to contract for service to junction platform serving as gathering station).

Because the *Transcontinental* test is fact-intensive, the decisions in *Hughes* and *Labove*, *supra*, provide little guidance to the current dispute. The platform from which the work was done in this case is not a commingling station; its purpose was to aid in production. Moreover, the work here involved pulling casings out of a wellbore. The cases relied on by Hilcorp are therefore distinguishable.

In sum, the objects of the agreement, the casings in the wellbore, had a geographic and functional nexus to the wells. Accordingly, the agreement pertained to a well.

15

## 2. THE AGREEMENT IS RELATED TO THE EXPLORATION, DEVELOPMENT, PRODUCTION, OR TRANSPORTATION OF OIL

*Transcontinental* step two asks whether the agreement concerns any operations related to the "exploration, development, production, or transportation of oil . . . including but not limited to . . . plugging" or to "perform any portion of any such work or services or any act collateral thereto." La. Rev. Stat. Ann. § 9:2780(C).

Hilcorp tries to escape this statutory language by suggesting that cutting and pulling casing was separate and distinct from the overall plugging operation. It is clear from the record, however, that cutting and pulling the casing was at least collateral to the plugging process. First, step 31 of Hilcorp's P&A procedure lists "[m]echanically cut & recover 10-3/4",, 16", & 26' casing @ 15 'BML."[27] Step 32 is "P&A complete."[28] Accordingly, Hilcorp's own documents suggest that the P&A operation was not complete until the casings were pulled and cut.

Second, The Bureau of Safety and Environmental Enforcement investigation noted that on the date of the accident, "a P&A contract crew was preparing to continue operations to P&A Well NO.2 on the A-Platform by lifting the Power Swivel from the main

---

[27]   R. Doc. 58-6 at 10.

[28]   *Id.*

deck and installing the Casing Jack to pull casing."[29] Again, cutting and pulling casing is referenced as part of Hilcorp's P&A operation. The report demonstrates that P&A was ongoing at the time of the accident.

This evidence reveals that cutting and pulling the casing was a necessary part of the overall operation to plug the wells. Hilcorp asks this Court to focus on the oral agreement to cut and pull casing without any context. The Court finds this kind of splicing and dicing contrived. A similar argument was raised and rejected in *Teaver*. In *Teaver*, the Court held that a work order to dismantle the crane on a platform was part of a plug and abandon operation and satisfied the *Transcontinental* test. The Court noted:

> Limiting the Court's inquiry to those service orders would not only paint an incomplete picture of the scope of the agreement between the parties, but it would also lead to absurd results. In essence, such a limitation would require the Court to find either that Mariner contracted with Seatrax to have Seatrax bring a crane to the SMI-136B platform and to dismantle it, with no other intended use for the crane, and/or that the dismantling of the crane constituted a separate agreement between the parties. Making these findings would mean that contractors are only covered under LOAIA while they are actually performing the contracted work, but not while they perform on-site tasks necessary and incidental to the contracted work. Here, this would draw an arbitrary line between the actual performance of the work and the final steps required for completion of the work, i.e. removal of the equipment. In the face of a service record which clearly demonstrates that the parties contracted to use the crane as part of an overarching plug and abandonment operation, as well as clear statutory

---

[29] R. Doc. 68-2 at 46.

> language which states that LOAIA covers "act[s] collateral
> [to the agreement]," the Court declines to make such
> findings.

*Teaver*, 2012 WL 5866042 at *4. This Court likewise does not find that cutting and pulling the casings can be logically severed from the overall plug and abandonment operation. Adopting Hilcorp's argument would mean that LOAIA applies to the first 20 or so tasks outlined in its P&A procedures, but that LOAIA would cease to apply at some arbitrary point in carrying out the plan. Neither the statute nor the Fifth Circuit's test anticipated such an odd result. Instead, the context of the agreement to cut and pull casings within the overall scheme to plug and abandon the well demonstrates that it is an agreement collateral to plugging the well. The agreement falls within the plain terms of La. Rev. Stat. Ann. § 9:2780(C), and the *Transcontinental* test is satisfied.

### C. ALLIANCE'S OBLIGATION TO INDEMNIFY HILCORP IS EXTINGUISHED

Because LOAIA applies to the agreement, Alliance's obligations to defend, indemnify, or comply with the additional-named-insured provisions of the MSC are voided. La. Rev. Stat. Ann. § 9:2780(B), (G). Accordingly, Hilcorp's motion for summary judgment is DENIED, and Alliance's motion for summary judgment is GRANTED.

**IV.  CONCLUSION**

For the above reasons, Hilcorp's motion for summary judgment is DENIED, and Alliance's motion for summary judgment is GRANTED. Hilcorp's declaratory-judgment action is DISMISSED with prejudice.

New Orleans, Louisiana, this 17th day of April, 2013.

_____

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE